Points decided.

[No. 3,161.]

# REDINGTON et al. *v.* WOODS et al.

Liability of Drawee of Check.—The drawee of a check is bound, at his peril, to know the handwriting of the drawer; and if he pay a check to which the signature of the drawer has been forged, he must suffer the loss as between himself and the 'drawer, or an innocent holder to whom he has made payment.

Presumption as to Signature and Handwriting in Check.—The drawee of a check is presumed to be acquainted with the signature of the drawer, but not with the handwriting in the body of the check; and the fact that the handwriting in the body of the check is not that of the drawer raises no presumption that it is not genuine.

Liability for Payment of Altered Check.—If the drawee pay, even to an innocent holder, a check which has been fraudulently altered in amount after it left the hands of the drawer, he will be entitled to recover back from the person to whom it was paid the excess over the true amount of the check, unless the alteration is made in such a manner that on the face of the paper there appears enough to excite suspicion of fraud, or the drawee has information which would lead a prudent person to suspect that the check has been altered.

Suspicious Facts Requiring Inquiry.—Where a party received from a stranger, in exchange for legal tender notes, what purported to be a genuine check of a third person, the signature being genuine, and the writing in the body of the paper being in the usual form, though in a handwriting different from that usually employed, and on applying by an agent for payment of the check, informed the drawee that the check had been presented by a stranger: *held*, that these facts were not of such a suspicious character as to put the drawee on inquiry as to the genuineness of the check; and that if there was any negligence in the case on either side (the check having, after payment, been discovered to have been altered as to the amount), it was on the part of the holder in receiving the check.

Laches in Demanding Payment—*Query?*—Whether, in such a case, a delay of nine days by the drawee in demanding repayment of the holder constitutes such laches on the part of the drawee as will defeat the action?

Laches in Failing to Return Altered Check.—Where the drawee of an altered check fails to return or offer to return it to the party to whom he paid it, he is guilty of laches.

Undertaking of Holder on Presenting Check for Payment.— When the holder of a bank check or bill presents it for payment to the drawee, and indorses it, he undertakes with the drawee that the prior indorsements are genuine, and that he has a valid title and a right to receive the money; but the indorsement of the holder does not of itself import an undertaking that the check has not been altered in amount.

RIGHT TO RECOVER FOR MONEY PAID ON ALTERED CHECK.—The right of the drawee to recover back the amount paid on an altered check rests upon the fact that the money was paid by the drawee without consideration under an innocent mistake, and not upon the indorsement of the holder, as importing a promise to refund the money in case it should afterwards appear the check had been fraudulently altered.

APPEAL from the District Court of the Twelfth Judicial District, City and County of San Francisco.

The facts are stated in the opinion.

*John Currey,* for Appellants.

1. The payee of a check payable to the payee or order, who indorses it upon presenting it to the drawee or acceptor, does not guaranty or warrant it to be genuine. (Morse on Banks and Banking, 312.)

"The indorser is not liable, in any instance, to the acceptor, unless in the case of an acceptance for his honor, or for his accommodation." (Chitty on Bills, 13th Am. ed. 243.) Though he might, by indorsing and transferring it to any other person, be held liable upon its dishonor and due notice thereof.

In *Coggill* v. *Am. Ex. Bank,* 1 N. Y. 117, Judge BRONSON said: "It is enough that the holder has a good title to the bill, so that the acceptor, upon paying it, can properly charge the amount against the funds of the drawer in his hands, if there be any; and if there be none, that he may have an action against the drawer for money paid to his use. As the acceptor can never resort to the payee or indorser, he has no interest in knowing through whose hands the bill has passed, except for the purpose of ascertaining that the holder has a good title."

Checks require no acceptance as distinct from payment when presented. (*In the Matter of Brown,* 2 Story R. 512, 513.) And when drawn payable immediately on present-

ment, are not entitled to days of grace. (3 Kent, 103; 4 Cal. 35.)

The payee of a check, payable to him or order, who indorses it on presenting it for payment, does not stand to the drawee as an indorser of a promissory note stands to his indorsee, nor as the payee of a check or bill of exchange, who indorses it, to any person other than the drawee stands to such person. The acceptor of a bill of exchange is the principal debtor, and the indorsement of such bill by the payee, upon its payment, carries with it no liability. Its value in the hands of the acceptor is as a receipt and voucher, and that is all.

As between the drawer and drawee of a check or bill, the latter is bound to know the handwriting of the former, and not only this, but he must show, if he would justify the payment, that the bill is genuine, not in signature only, but in every respect. (Per Bayley, J., in *Hall* v. *Fuller*, 5 B. & C. 750.)

"He should be well satisfied that the sum to be paid was inserted by the drawer, and not subsequently altered." (Chitty on Bills, 13th Am. ed. 391, 392; *Bulkley* v. *Butler*, 2 B. & C. 434.)

"Erasure may, in general, be detected, but there are modes of expunging writing and figures, and of inserting larger sums, so that a drawee, before he accepts or pays, must be quite certain, not only that the drawer signed the bill, but also that he originally authorized the payment of the sum apparently named in the bill; and if he should accept for or· pay more than the sum inserted by the drawer, he may be without remedy." (Chitty on Bills, 159, 160.)

If the drawee "accepts or pays a bill in the hands of bona fide holder for value, he is concluded by the act, although the bill turns out to be a forgery. If he has accepted, he must pay; and if he has paid, he cannot recover the money back. This is an exception to the rule that money paid

under a mistake of fact may be recovered back." (Per Bronson, C. J., in *Goddard* v. *The Merchants' Bank*, 4 N. Y. 149.)

In the same case, at page 152, RUGGLES, J., said: "It being the duty of the drawee to satisfy himself of the genuineness of the bill before he accepts or pays, and it being important to the holder and other previous parties that he shall do so, it is settled that he accepts or pays at his peril." ·

2. It is settled law that, as between drawer and drawee, the drawee or acceptor of a check or bill pays or accepts at his risk or peril, as to the genuineness of the check or bill in respect to the sum of money named in it, as well as to the genuineness of the name of the drawer; and it is equally well settled that, as between the bona fide holder of a check or bill and the drawee, the drawee pays or accepts at the risk of the loss of all he may pay or bind himself by acceptance to pay, in case the entire check or bill be a forgery; but, as between such holder and the drawee, who pays upon presentment of the check or bill, duly signed by the drawer, it is held, in some cases, that the holder who receives the money, though innocent, must refund it, if the sum on the face of the check or bill has been fraudulently increased in amount, to the extent of the increase; provided, however, the drawee or acceptor be also innocent and without any fault on his part, and immediately makes proper demand to the payee for the money, if payment has been made, and tenders back the check or bill.  On the contrary, there are cases which hold that money paid to a bona fide holder, under such circumstances, cannot be recovered back—that " there is no reason to throw off the loss from one innocent man upon another innocent man." (*Price* v. *Neal*, 3 Burr. 1254; *Gloucester Bank* v. *Salem Bank*, 17 Mass. 42.)

If the defendants could be charged at all, they were en-

titled to immediate notice from the bank of its intention to require the repayment of the money, and also entitled to a return to them of the check.  (*Goddard* v. *The Merchants' Bank*, 4 Com. 152.)

3. If the bank paid the money in utter carelessness to the defendants, who, in good faith, paid full value for the check, it cannot recover the money back. (2 Parsons on Notes and Bills, 598.)   Or, "if the bank did not pay it (the money) in carelessness, but has carelessly delayed a notice until the payee has lost an opportunity of indemnity, which an earlier notice would have given, it would seem to be certain, on general principles, that the bank cannot recover back the money it has paid." (2 Parsons on Notes and Bills, 598.)

In the early cases it was held that the notice, in cases of forgery, must be given on the very day of payment, and before any change of circumstances.   In *Price* v. *Neal*, 3 Burrows, 1354, "a considerable delay" was held fatal; in *Smith* v. *Mercer*, 6 Taunt. 76, seven days; in *Davis* v. *Watson*, 2 Nev. & Man. 709, two weeks; in *Ellis* v. *Ohio Life Insurance and Trust Co.*, 1 Handy, 97, ten days; and in *Gloucester Bank* v. *Salem Bank*, 17 Mass. 33, fifteen days—was so held.

The recent cases generally hold that the payer is entitled to a reasonable time after payment to detect the forgery, and demand restitution.   But what is reasonable time? Reasonable diligence, it is said, is all that can be required. But the notice, requisite to charge the holder to whom the money was paid, must be given as soon as the forgery is discovered.   (2 Parsons on Notes and Bills, 599.)

Mere information of the forgery was not notice that the bank or plaintiffs intended to look to the defendants for repayment.   It was not a demand to the defendants to refund. Neither the bank nor plaintiffs so regarded it, as their subsequent conduct plainly shows.   Even knowledge is not equivalent to notice, as was held in *Esdaile* v. *Sowerby*, 11

East, 114; *Tindall* v. *Brown*, 1 D. & E. 169; *Burgh* v. *Legge*,
5 Mees. & Welsby, 418, 420; *Caunt* v. *Thompson*, 7 C. B.
400, 410 ; *Gibbs* v. *Cannon*, 9 Serg. & Rawle, 198, 201.
Notice, in such case, in a legal sense, is more than mere
information of the fact that the instrument had been altered
in a material part.   To operate as a notice demanding the
money back, the notice must inform the party sought to be
charged that payment is expected of him.   (*Mills* v. *Bank
of the United States*, 11 Wheat. 431, 441.)

The bank, having paid the check, under the circumstances
detailed by the findings of the District Court, is estopped
from alleging that the sum mentioned in the check was not
justly payable to the defendants.

The inclination of Courts in regard to estoppel *in pais*,
where the subject matter in issue is real property, has been
to confine the doctrine within narrow limits; but not so in
regard to commercial matters, where men are obliged to
trust much to appearances.   Thus it has often been laid
down that the acceptor is precluded from disputing the
drawer's ability, or, if after sight of the bill, handwriting.
(*Beeman* v. *Duck*, 11 Mees. & Wels. 251; 2 Smith's Lead.
Cases, 619.)

It is said to be a very old head of equity that, if one make
a representation to another going to deal in a matter of in-
terest, upon the faith of that representation, the former shall
make it good, and this, whether he made such representa-
tion in entire good faith or otherwise; because, if, in fact, it
is false, it operates as a surprise and imposition upon the
party relying upon it.   (1 Story's Eq., Sec. 193; *Smith* v.
*Richards*, 13 Peters, 36; *Pearson* v. *Morgan*, 2 Bro. Ch. R.
388.)

" A party will always be held to make good his statement
in the form in which he makes it.   If he states a thing as
true in general terms, without qualification, then he is pre-
sumed to do so upon his own knowledge, or at his own

peril, and must make good his assertion." (*Neville* v. *Wilkinson*, 1 Bro. Ch. R. 546.)

*Winans*, for Respondents.

The indorsement of Woods & Cheesman, the defendants, was a guarantee of the genuineness of the check. The rule is absolute and unqualified, that an indorser guarantees, by his indorsement, that he has a clear title to the bill, note, or certificate indorsed. Nor are checks any exception to the rule. (*Mills* v. *Barney*, 22 Cal. 248.)

The evident meaning is that the defendants, by their agent, Hayden, undertook and agreed that the signature of Cox was genuine; consequently Mills, the banker, who issued the certificate of deposit to Cox, as payee, and who paid it to Wells, Fargo & Co., upon their indorsement, afterwards recovered the money back from them upon showing that the previous indorsement of Cox was a forgery, and that he had been compelled, therefore, to pay the certificate to Cox. (*Olivier* v. *Landry*, 7 Louisiana, 496.)

The last indorsement of a note or bill is a guarantee of all preceding indorsements; it admits the handwriting of the drawee and all prior indorsers. The last indorser is consequently liable, although the preceding indorsements were forgeries. (*Harris* v. *Bradley*, 7 Yerger, 310.)

There is a warranty implied in the transfer of every negotiable instrument that is not forged. (*Herrick* v. *Whitney*, 15 Johns. 240; *State Bank* v. *Fearing*, 16 Pick. 533; *Smith* v. *Chester*, 1 Term, 654; *Lambert* v. *Pack*, 1 Salk. 127.) And that the rule applies to checks as well as other commercial paper is shown by the case of *Murray* v. *Judah*, 6 Cowen, 483, where it is held that one who has transferred a check impliedly warrants his title and the genuineness of the paper. Says the Court, page 491: "The objection seems to be that Foote was responsible upon the implied warranty of the genuineness of the check, and of his own title to it, which

it has been repeatedly held accompanies the transfer of all negotiable paper."

By holding that the indorser of a check warrants the "title," the Court there meant, as does also this Court in *Mills* v. *Barney*, that he warrants title to it for the amount named, as well as in other respects; since, if the check be indorsed, and payment demanded for an altered and simulated amount, in excess of the genuine sum for which the check was drawn, the indorser has no title to it to the extent of such excess. Indeed, he warrants the genuineness of the paper; and that genuineness applies no less to a forgery of the sum than to a forgery of the signatures.

In *Minturn* v. *Fisher*, 4 Cal. 37, this Court decides that "there is little or no difference between checks, so-called, and bills of exchange, except so far as that difference may arise from the custom of merchants, or the statute regulations of the particular jurisdiction in which they are used. They are similar in form, and the modern decisions of the Courts have placed them on the same footing. (*Dick* v. *Leverich*, 11 Louisiana, 576; *Talbot* v. *Bank of Rochester*, 1 Hill, 295; *Hartsman* v. *Henshaw*, 11 Howard, 183.)

Where a bank pays an altered check it can recover back, from the party to whom such payment was made, the difference between the true amount and that to which it was altered, in all cases, and as well without as with the indorsement of the party to whom it was paid.

In Morse on Banks and Banking, 300, this question is thus presented: "The rule requiring the bank to know the customer's handwriting is confined in its practical effect to requiring a knowledge of his signature. Neither law nor the ordinary course of business renders it a matter of suspicion that the body of the check or bill is not written in the drawer's hand. Nevertheless, a false or fraudulent alteration in a material point, made in the body of the check or bill, renders the document a technical forgery, just as much

as the simulating of the signature itself.  Knowledge of the drawer's signature is of course no possible guide for the detection of this description of forgery, and in such cases a modification of the general rule that payment on forged paper is no payment, has to be made in deference to the sheer necessities of justice." (*Sewall* v. *Boston Water Power Co.*, 4 Allen, 277; *Goodman* v. *Easton*, 4 N. H. 455; 2 Parsons on Bills and Notes, 583.)

And again, Morse on Banks and Banking, 309: "The rule was laid down in the case of *The Canal Bank* v. *Bank of Albany*, 1 Hill, 287, that acceptance and payment, or either, concludes the drawees, as against the payees, only as to the genuineness of the drawer's signature.  If anywhere in the chain of orders or indorsements there is a forgery, the bank may recover back, even though a considerable time has elapsed since the payment, provided that it acts with due promptitude and dispatch, so soon as the discovery is made."

Upon this point the leading authority is that of *The Bank of Commerce* v. *Union Bank*, 3 Comstock, 230; and the opinion of the Court there, if recognized as law, must be conclusive of the case at bar.

The rule is absolute, that when money is paid on a forged draft, where the parties are in mutual fault, and are equally bound to inquire, payment can always be recovered back.

In *Merchants' Bank* v. *McIntyre*, 2 Sandf. Sup. C. 431, where a draft on a bank was presented for payment by a remote indorsee, to whom it was paid, both parties being ignorant of the fact that the first indorsee, to whom it was specially indorsed, had never indorsed the draft, but that a fictitious signature, resembling his, was placed on the draft, it was held that money paid under a mutual mistake of facts may be recovered back, and that, on discovering the fraud, the bank could recover the amount from the party to whom it was paid.

An elaborate review of the principal cases on this point

is presented in *Ellis & Morton* v. *Ohio Life Insurance and Trust Co.*, 4 Ohio State, 628; *Price* v. *Neal*, 3 Burrows, 1355; *Lang* v. *Adams*, 6 Mass. 187; *Markle* v. *Hatfield*, 2 Johns. 462; *Wilkinson* v. *Johnson*, 3 B. & C. 435; *Canal Bank* v. *Bank of Albany*, 1 Hill, 290.

These objections, viz: that plaintiffs lost their rights by laches, in neglecting to give notice of the forgery, and by not making a timely demand for repayment, and by not tendering to defendants a return of the forged check, are urged by defendant as constituting a defense to this action. But the authorities do not sustain them in either proposition. (*Canal Bank* v. *Bank of Albany*, 1 Hill, 291; Chitty on Bills, Am. ed. of 1839, p. 463; *Goddard* v. *Merchants' Bank*, 4 Comstock, 156; id., 2 Sandf. 256; *Bank of Commerce* v. *Union Bank*, 4 Comstock, 237; *Ellis* v. *Ohio Life Ins. and Trust Co.*, 4 Ohio State, 656; *Merchants' Bank of N. Y.* v. *Exchange Bank*, 8 La. 670; 16 La., old ed. 457.)

As to plaintiffs' omission to tender a return of the altered check, defendants seem to press it as a defense, or, at least, a makeweight in their favor, that "no offer to return the check was made," and say "the defendants were certainly entitled to the check, if they were to be charged with its loss, even though it possessed no intrinsic value." Certainly, if it possessed no value, a neglect to return it would not constitute a defense, for *lex neminem cogit ad vana*, and, besides, if they were entitled to it, it was their business to ask for it, when it would have been given them, without a doubt. The possession of something so worthless was not considered by either party a subject of sufficient importance to become a matter of consideration, and the present use, as an argument on defendants' behalf of plaintiffs' failure to tender a return, is nugatory.

By the Court, CROCKETT, J.:

The plaintiffs were merchants doing business in San Francisco, and kept their bank account with the "London and San Francisco Bank, Limited." On the 11th of February, 1870, they sold to a stranger a small bill of goods, who, after concluding his purchase, requested them to issue to him their check for thirty dollars, which he said he desired to send to the country. The request was complied with and the check issued in the usual form, payable to John Crane or order, and the stranger paid to the plaintiffs for the check thirty dollars in gold coin. On the following day a person, who was unknown to the defendants (who were stock and money brokers, also doing business in San Francisco), called at their place of business and inquired the price of United States legal tender notes, saying he wished to purchase three thousand five hundred dollars of such notes. On being informed that the defendants would sell him the notes at a specified price he left without concluding the purchase, but returned in about half an hour and produced a check purporting to have been made by the plaintiffs, bearing date on that day (February twelfth), and payable to *the defendants* or order, for two thousand nine hundred and thirty-one dollars and twenty-five cents, drawn on the "London and San Francisco Bank, Limited," with which bank the plaintiffs kept their bank account. The amount specified in the check was the exact sum requisite to purchase three thousand five hundred dollars in legal tender notes at the rate before mentioned. The check was offered and accepted in payment for the notes; but as the employés of the defendants, who were making the transaction, were wholly unacquainted with the person who offered the check, they deemed it prudent to send it to the bank for payment, whilst they were counting out the notes. The check was accordingly indorsed by the defendants, and a messenger was dispatched with it to the bank for

collection.   The messenger proceeded immediately to the bank and presented the check to the paying teller, saying that the defendants " knew the house of plaintiffs was all right, but that they did not know the man who presented it, who was a stranger, and they asked him to go to the bank and collect it for them."   After first looking at the face of the check and then at the back of it, the teller, in answer to the question of the messenger, " Is that good?" remarked that it was all right, and immediately paid the check, and stamped it with the usual words indicating payment by the bank.   But, before the messenger reached the defendants' place of business with the money, the transaction with the stranger had been concluded and he had left the defendants' office with the legal tender notes, several minutes before the messenger returned.   One of the clerks of the defendants, however, followed a short distance behind the stranger for a block or two, so as to observe his movements, until the latter entered a cellar on Kearny street and was out of sight; whereupon the clerk returned to the office, and on his arrival found the messenger there with the money received for the check.   On the first or second of the following month the plaintiffs and the officers of the bank discovered for the first time that the check issued by the plaintiffs on the eleventh of February, for thirty dollars, had been fraudulently altered by changing the date from the eleventh to the twelfth of February, and by inserting in the body of it the name of the defendants' firm as payees, and by raising the amount from thirty dollars to two thousand nine hundred and thirty-one dollars and twenty-five cents, and in this altered form the check was paid by the defendants, as above stated.   On the same day on which the fraud was discovered, the plaintiffs and the officers of the bank notified the defendants of it; but no formal demand was made upon the defendants for

a return of the money until the ninth of March. The check has never been returned, or offered to be returned to the defendants; but immediately on the discovery of the fraud the plaintiffs and the bank employed detectives to search for the person who delivered the check to the defendants; but they were unable to find him, and he has not been discovered.

The Court finds that the defendants received the check in good faith, in the usual course of business, and for a full and valuable consideration. It also appears from the findings that it was the custom for each member of the plaintiffs' firm to draw and fill up checks, and that occasionally the body of the check was filled up by a book-keeper or clerk; and that for the whole period during which these checks were being drawn and paid the paying teller of the bank was the same who paid the check in question in this action. It further appears that the writing in the altered check, except the signature of the drawers, was in a heavy hand, and unlike in appearance any of the genuine checks produced at the trial, of which there were more than forty, drawn during the same month in which the altered check was issued. The Court also finds that the defendants never doubted the genuineness of the check, but wanted it cashed, as they did not know how the man who presented it came by it.

A stipulation was filed in the cause to the effect that in order to avoid circuity of action, and to end litigation concerning the check and its payment, the Court might determine in this action whether the loss should fall upon the plaintiffs, the defendants, or the bank, and might enter the appropriate judgment, with like effect, as though the appropriate action had been brought. On these facts the Court entered a judgment for the plaintiffs, from which the defendants have appealed.

The rule is well settled that the drawee of a check is

bound, at his peril, to know the handwriting of the drawer; and if he pays a check to which the signature of the drawer was forged, he must suffer the loss, as between himself and the drawer, or an innocent holder to whom he has made payment. As between himself and the drawer, he undertakes that he will pay no checks, except such as have the genuine signature of the drawer, which he assumes to know; and as he is presumed to be acquainted with the signature, he will not be allowed to recover the money back from an innocent holder, who is not presumed to have such knowledge. But there is no presumption that the drawee is acquainted with the handwriting in the body of the check, inasmuch as checks are often filled up in the handwriting of persons other than the drawer, and with which the drawee is not presumed to be familiar, and may have had no opportunity whatever to become acquainted. If the rule were otherwise, the drawee could never safely pay a check filled up in a handwriting that was new to him, until he had first satisfied himself by inquiry from the drawer whether the check had been properly filled up. This would result in such delay and inconvenience as greatly to interfere with commercial transactions, which are so largely carried on by means of checks. The rule is, therefore, now well settled, that if the drawee, in good faith, and without negligence, pay even to an innocent holder a check, which has been fraudulently altered in amount, after it left the hands of the drawer, he will, ordinarily, be entitled to recover back from the person to whom it was paid the excess over the true amount of the check. "The rule requiring the bank to know the customer's handwriting is confined, in its practical effect, to requiring a knowledge of his signature. Neither law nor the ordinary course of business renders it a matter of suspicion that the body of the check or bill is not written in the drawer's hand. Nevertheless, a false or fraudulent alteration in a material point, made in the body of the check

or bill, renders the document a technical forgery, just as much as the simulating the signature itself. Knowledge of the drawer's signature is, of course, no possible guide for the detection of this description of forgery, and in such cases a modification of the general rule, that payment on forged paper is. no payment, has to be made in deference to the sheer necessities of justice." (Morse on Banks and Banking, 300.)

In the *Bank of Commerce* v. *Union Bank,* 3 Comst. 234, RUGGLES, J., in delivering the opinion of the Court, says: "The payment of a bill of exchange by the drawee is ordinarily an admission of the drawer's signature, which he is not, afterwards, in a controversy between himself and the holder, at liberty to dispute. * * * The drawee is supposed to know the handwriting of the drawer, who is usually his customer or correspondent. As between him, therefore, and an innocent holder, the payer, from this imputed negligence, must bear the loss." In support of this proposition he quotes *Price* v. *Neal,* 3 Bur. 1354; *Wilkinson* v. *Suteridge,* 1 Strange, 648; and Story on Bills, Sec. 262—to which many other authorities might be added. "But," he says, "it is plain that the reason on which the above rule is founded does not apply to a case where the forgery is not in counterfeiting the name of the drawer, but in altering the body of the bill. There is no ground for presuming the body of the bill to be in the drawer's handwriting, or in any handwriting known to the acceptor. * * * No case goes the length of saying that the acceptor is presumed to know the handwriting of the body of the bill, or that he is better able than the indorsers to detect an alteration in it. The presumption that the drawee is acquainted with the drawer's signature, or able to ascertain whether it is genuine, is reasonable. In most cases it is in conformity with the fact. But to require the drawee to know the handwriting of the residue of the bill is unreasonable. It would, in most cases, be requiring

an impossibility. Such a rule would be not only arbitrary and rigorous, but unjust." The same principle is recognized in *National Park Bank* v. *Ninth National Bank*, 55 Barb. 124, in which, after conceding that the drawee of a check is bound, at his peril, to know the signature of the drawer, the Court says: "But the liability extends no further; and where the genuine draft has been altered, not only in the name, but in the amount to be payable, I do not think that rule should hold the drawer liable for any more than the amount of the original draft; and for the balance the plaintiff should recover. * * * I think the rules, as heretofore settled, viz: that the drawee is bound to know the handwriting of the drawer, and is liable for a draft which he pays, although forged, and the other, that where the body of the draft is altered, the drawee may recover the amount from the person receiving it, may both be applied to this case, and should lead to the result before stated." The same case was taken to the Court of Appeals, and is reported in 46 New York R. 77. In that Court the judgment was reversed, on the ground that the *signature* of the drawer was forged, and for that reason the drawee was not entitled to recover. But there is nothing in the opinion of the Court in conflict with the proposition that if the signature of the drawer had been genuine, and the bill had been altered only in the amount, the drawee would have been entitled to recover. There is, indeed, little or no conflict in the authorities on this point, and the rule, that the drawee is not presumed to know the handwriting in the body of a bill or check, and is not bound, before payment, to ascertain, at his peril, that the amount has not been altered in the body of the bill, is founded on principles of reason and justice, and ought not to be disturbed. There may, however, be exceptions to this general rule. If the alteration be made in such manner that on the face of the paper there appears enough to excite a reasonable suspicion of fraud, or if the drawee

has information which would lead a prudent person to suspect that the bill had been altered, it would, doubtless, be his duty to decline payment, until the doubt was removed.

I am, therefore, of opinion, that if there were no such suspicious circumstances in this case, and if the bank was guilty of no *laches* after the discovery of the fraud, it is entitled to recover.

It is claimed, however, for the defendants, that the handwriting in the body of the check, so different from that usually found in the plaintiffs' checks, was of itself sufficient to excite a well founded suspicion in the paying teller that the check had been tampered with; and that, when there was superadded to this the information given to him by the defendants' messenger, common prudence required that he should investigate the matter before payment. We have already seen that the fact that the handwriting in the body of the instrument was not that of the drawer raised no presumption that the check was not genuine. The findings show that checks of the plaintiffs' firm were filled up, sometimes by the member of the firm who signed the firm name to it, and at other times by the clerks and bookkeepers; and the bank teller cannot be presumed to know but that the plaintiffs had employed a new clerk or bookkeeper who had filled up the check. But aside from this consideration, the mere fact that the body of the check was in a different handwriting from that usually employed was not of itself sufficient to raise the slightest suspicion of fraud. The practice is so common in all commercial communities of causing checks of the same drawer to be filled up in different handwritings, that it is not to be presumed the attention of the drawee will be particularly called to the handwriting in the body of the paper. It is the signature which verifies the instrument and not the writing in the body of it, and if the signature be genuine and the writing in the body of the paper in the usual form, though in a different handwriting

from that usually employed, there will be nothing in the latter circumstance to excite the slightest suspicion of fraud.

Nor was there anything stated by the messenger to the teller which could justly arouse a reasonable doubt in respect to the genuineness of the check. The only fact stated by him was that the "defendants knew the house of plaintiffs was all right, but that they did not know the man who presented it (the check), who was a stranger, and they asked him to go to the bank and collect it for them."

The only fact included in this statement was that the man who presented the check was a stranger to the defendants, and if this of itself should have put the bank upon inquiry, much more should it have had that effect with the defendants themselves, who were about to part with a large sum of money to the stranger on the faith of this check, and who had brought it to them payable to their order, and for the precise sum necessary to purchase the legal tender notes. There was certainly more to excite the suspicion of the defendants than of the teller, and yet, instead of sending their messenger to the plaintiffs to ascertain if the check was genuine and how it came into the stranger's possession, they sent him to the bank with no other instructions than to collect the money. They did not expect the teller to enlighten them as to the stranger or how the check came into his possession. If they were seeking information on that point they would naturally have applied to the drawers of the check and not to the officers of the bank, who could not be supposed to have any information on the subject. If there was negligence on either side it was on the part of the defendants and not the bank. (*Commercial and Farmers' National Bank* v. *First National Bank*, 30 Md. R. 11.)

But it is said the bank was guilty of *laches*, after the discovery of the fraud, in not promptly demanding payment of the defendants, and in not having returned or offered to return the check. It appears from the findings that on the

same day on which the fraud was discovered the defendants were notified of it, but a formal demand of payment was not made until about nine days thereafter.

It is clear that a demand was not necessary, if viewed in the light of a condition precedent merely. If necessary at all it was only on the ground that in view of it the defendants may have had an additional motive for greater diligence in searching for the forger and seeking restitution.

During the nine days which elapsed after the discovery of the fraud, and before payment was formally demanded, the defendants may possibly have omitted all effort to discover the person from whom they received the check, under the belief that the plaintiffs or the bank had concluded to submit to the loss.

If the omission to make the demand promptly is entitled to any weight (a point not decided), it is only for the reason that the defendants may thereby have been lulled into security, and have omitted efforts they would otherwise have made to procure indemnity. In that view, the failure to make the demand may possibly have been *laches*.

But I deem it unnecessary to decide the point in this case. The failure to return, or offer to return, the altered check to the defendants, presents a question of more difficulty. In the case of the payment of counterfeit bank notes, the rule appears to be well settled that, in order to recover the consideration from a person who innocently paid them out, the holder must return them promptly. The case of *Gloucester Bank* v. *Salem Bank*, 17 Mass. 33, was an action of that character; and the Court held that a delay of fifteen days in returning the notes was fatal to the action. In delivering the opinion of the Court, Chief Justice PARKER says: "The true rule is, that the party receiving such notes must examine them as soon as he has opportunity, and return them immediately. If he does not, he is negligent, and negli-

gence will defeat his right of action. This principle will apply in all cases where forged notes have been received."

After saying that the delay of fifteen days was too great, he continues: "The defendants then had no means of looking up those from whom they had received the notes; and, although there is no evidence in the case from which it can be ascertained that they could have saved themselves if they had received earlier notice, the law will presume that a change of circumstances had taken place, which would justify them in resisting the action."

The same rule was announced by the Supreme Court of the United States, in the case of the *Bank of the United States* v. *Bank of Georgia*, 10 Wheat. 333. This, also, was an action to recover the consideration paid for counterfeit bank notes, which were not offered to be returned until after the lapse of nineteen days from the time when they were received. Mr. Justice STORY, in delivering the opinion of the Court, says: "The holder, under such circumstances, may not be able to ascertain from whom he received them, or the situation of the other parties may be essentially changed. Proof of actual damage may not always be within his reach; and, therefore, to confine the remedy to cases of that sort would fall far short of the actual grievance. The law will, therefore, presume a damage actual or potential sufficient to repel any claim against the holder. Even in relation to forged bills of third persons, received in payment of a debt, there has been a qualification engrafted on the general doctrine: that the notice and return must be within a reasonable time; and any neglect will absolve the payer from responsibility." In *Thomas* v. *Todd*, 6 Hill, 341, Mr. Justice BRONSON says: "Although the bill has no intrinsic value, it should be returned to the debtor, so as to enable him to trace out and fall back upon the person from whom

he received it. And for the same reason the bill should be returned, without any unnecessary delay."

These cases, it is true, grew out of the payment of counterfeit bank notes; and we have been referred to no case adjudicating the precise point involved in this action, nor have we been able to find one, after a somewhat diligent examination of the books. In the case of counterfeit bank notes, the person who receives them is held to great diligence not only in returning them on the discovery of the forgery, but also in the detection of the fraud. In the case of the *Gloucester Bank* v. *Salem Bank, supra,* the Court held that the person receiving such notes "*must examine them as soon as he has opportunity,* and return them immediately. If he does not he is negligent, and negligence will defeat his right of action."

The reason assigned for the strictness of the rule is, that delay in returning the notes would render it more difficult to trace out the person from whom the prior holder had received them, and to obtain restitution of the consideration paid for them. As between two innocent persons, neither should be allowed to impair or jeopardize the rights of the other by any negligence whatever, and he who commits the negligence should suffer the loss.

In the case of bank notes, a greater degree of diligence in detecting the fraud and returning the notes would doubtless be exacted than in respect to forged bills of third persons received in payment of a debt; concerning which, as we have seen, Judge STORY said in *Bank of the United States* v. *Bank of Georgia, supra,* that "the notice and *return* must be within a *reasonable* time; and any neglect will absolve the payer from responsibility." In general it is more or less difficult to identify a particular bank bill as that which was received from a particular person; and in a majority of cases it would perhaps be impossible to do so after a considerable delay. For this reason the return should be more promptly

made than in the case of a forged bill of a third person.
But in each case the person from whom the spurious paper
was received is entitled to the fullest opportunity to obtain
indemnity, if he can, from the prior indorsers or guarantors,
if there be any, and if there be none, then from the person
to whom he paid the consideration. If there be prior in-
dorsers to whom he may look, it is quite obvious that his
remedy would be incomplete, and perhaps ineffectual, with-
out the possession of the forged paper. There may have
been several prior indorsers, and each in turn would be enti-
tled to the bill in order the more effectually to assert his
rights against those who preceded him. But if there were
no prior indorsers his remedy against the person from whom
he received the forged check or bill is plain. If the defend-
ants in this case had refunded the money on being notified
of the forgery, or on the subsequent demand of payment,
their right to proceed against the stranger from whom they
received the check would have been unquestionable; and it
is clear that they could not effectively have prosecuted civil
proceedings against him without the possession of the check.
It may possibly be that he also was innocent of the fraud
and received the check in good faith; in which event, on
refunding the money he received, he would be entitled to
the check to enable him to assert his rights against the per-
son from whom he received it. But it is insisted on behalf
of the plaintiffs: First, that the defendants waived a return
of the check; and second, that a return of it could not have
benefited them inasmuch as the person from whom they re-
ceived it immediately disappeared, and cannot now be found
after diligent search.

On the first point it is sufficient to say that the record fur-
nishes no evidence of a waiver; and on the second point the
reply may be found in the language of Judge STORY, already
quoted, where he says "the law will presume a damage
actual or potential, sufficient to repel any claim against the

holder;" or in the words of Chief Justice PARKER in *Glou-cester Bank* v. *Salem Bank*, "the law will presume that a change of circumstances had taken place which would justify them in resisting the action."

I am, therefore, of opinion, that a failure to return, or to offer to return, the check to the defendants, is a valid defense to the action; and on this ground the judgment must be reversed, and the cause remanded for a new trial. But in view of another trial, it may be proper to notice the proposition urged by the plaintiffs, to the effect that by indorsing the check the defendants guaranteed that it was genuine in respect to the amount appearing on its face. There is no conflict in the authorities on the point, that the holder of a bank . check, who accepts payment thereby, undertakes that all indorsements prior to his own are genuine, and that he is the lawful holder and owner of it. As we have already seen, he does not undertake that the signature of the *drawer* is genuine. With that the drawee is presumed to be acquainted, and is bound, at his peril, to know it. But there is no such presumption in respect to the signatures of the payee and indorsers, all of whom may be strangers to the drawee, and of whose handwriting he is not presumed to have any knowledge. When, therefore, the holder presents a check or bill for payment, the title to which he derives through prior indorsements, he undertakes with the drawee that these indorsements are genuine, and that he has a valid title, and, consequently, a right to receive the money. If it afterwards transpires that one or more of the indorsements are forged, the drawee will be entitled to recover back the money from the person to whom he paid it, on the ground that the latter had no title to the bill or check, and the payment was, therefore, made without consideration, under an innocent mistake. But the indorsement of the holder receiving payment can have, at most, no greater legal significance than this. It implies, at best, only

an undertaking that he has a valid *title* to the bill or check, and, consequently, a right to receive payment—an implication which the law raises without the indorsement. But the indorsement, *proprio vigore*, imposes upon him no other or greater liability to refund money paid upon an altered check than would attach to him without the indorsement. In other words, the indorsement does not, of itself, import an undertaking that the check has not been altered; and in proceedings to recover back the amount paid on an altered check the indorsement could not be made the foundation of the action, as importing a promise to refund the money, in case it should afterwards appear that the amount in the body of the check had been fraudulently altered. In such cases the right of recovery does not rest, in whole or in part, upon the indorsement, as importing such a promise, but upon the fact that the money was paid by the drawee without consideration, under an innocent mistake. The authorities in support of this view of the question are numerous and uniform, and we have been referred to none to the contrary.

Judgment reversed, and cause remanded for a new trial.

Mr. Justice Niles expressed no opinion.