## UNITED STATES *v.* NATIONAL EXCHANGE BANK.

*(Circuit Court, E. D. Wisconsin. February 2, 1891.)*

1. BANKS—PAYMENT ON FORGED INDORSEMENT—LIABILITY.

A bank that has paid a check on a forged indorsement is not responsible therefor to the drawer where the person who committed the forgery was identified to the bank by one who believed him to be the payee, and was in fact the person to whom the drawer had delivered the check, and whom he believed to be the payee.

2. SAME—NOTICE—LACHES.

The neglect of a drawer of a check, for more than a month after discovering that it had been paid upon a forged indorsement, to notify the bank that it will hold it responsible therefor, releases the bank from liability, even though it had notice of the forgery as soon as the drawer had.

At Law.

*Elihu Colman*, U. S. Atty.

*Van Dyke & Van Dyke*, for defendant.

BUNN, J. This action is brought to recover the sum of $1,259.05, the amount of a check drawn by the post-office department at Milwaukee on the defendant, in favor of one Anton Erben, and made payable to him or his order on December 3, 1889, and paid on that day by the bank to one Adolph Schuman upon a forged indorsement. The facts, about which there is no controversy, are substantially these: Some time

in July, 1889, Anton Erben, who had then recently come to this country from Austria, came to Milwaukee, and applied to the German Aid Society, and requested the secretary, Mr. C. Reuter, to help him to obtain work. This society is a corporation doing business in Milwaukee, its purpose being to render aid and give advice to emigrants and other persons who heed such assistance. After recording his name in the record book of the society, Erben was sent by the society to Elm Grove, Wis., to work on a farm. From here he drifted about, and finally settled down as a section hand on the railroad at Woodruff, Wis. Here he fell in with one Adolph Schuman, who was working and boarding at the same place, and with whom Erben became intimate. After a little Erben and Schuman fell to courting the same girl in the family of their host, to whom Erben disclosed the fact that he had a sum of money amounting to 3,000 guilders due him from Austria. By this means Schuman, as is supposed, soon after, became possessed of the same secret, and from this moment set himself systematically and ingeniously at work to defraud Erben of this money. Woodruff was then the end of the line of the Milwaukee & Lake Shore Railroad, and had no post-office, the men going thence to Minoqua, five miles away, to get their mail. Schuman volunteered to carry Erben's letters to and from this post-office. On a certain Sunday, Erben wrote a letter to his father, Anton Erben, Sr., in Austria. In this letter he spoke of his money, and also a certain pass-word agreed upon between him and his father, without which the money was not to be sent; such pass-word being the date of young Erben's birth, July 9, 1849. On the way to Minoqua, Schuman opened this letter, which gave him the secret which was the key to unlock the treasure he sought. He at once opened correspondence with Anton Erben, Sr., at Oberhagen, Austria, always carrying over to Minoqua Erben's letters, and bringing them back from the office. He would open Anton Erben's letters to his father, read and destroy them, write others in their places, imitating Erben's hand, and signing his name. And when letters came for Erben, Schuman would destroy them and write others in their places. Finally he wrote a letter to Anton Erben, Sr., in Austria, requesting him to send the money, and giving the agreed pass-word, signing, as usual, Anton Erben's name. Then an answer came from Anton Erben, Sr., saying the money had been sent addressed to Anton Erben, care of the German Aid Society, Union depot, Milwaukee, Wis. This letter was also intercepted by Schuman. On reading it he returned to Woodruff, picked a quarrel with Erben, and announced his intention of leaving to find work elsewhere. This was about November 15, 1889. Schuman then came to some small place near Milwaukee, and from there wrote, signing Erben's name, to Mr. Reuter, secretary, to forward any mail addressed to him, as he expected valuable letters to come in care of the society. Soon two letters came addressed to Anton Erben in the care of the society, containing the money orders, and Mr. Reuter forwarded them as requested. On December 3d, Schuman presented himself at the office of the German Aid Society in Milwaukee, when the secretary tells him he does not know

him. "What," says Schuman, "don't you remember Anton Erben, who was here in July, and for whom you obtained work? Besides, you forwarded me some letters, and I have them here." He thereupon handed Mr. Reuter the money orders, and a letter from Anton Erben, Sr. Then Reuter begins to think he is indeed Anton Erben, and, without demanding further evidence, takes Schuman to Milwaukee post-office, and in his official capacity as secretary and agent of the German Aid Society in whose care the letters and orders had come, identifies Schuman as the true payee, indorses one order with Schuman, as "C. Reuter, Agent," and in the name of the society vouches for him. The postmaster, knowing that Reuter was the secretary and agent of the society in whose care these advices and orders had come, and that he had been in the habit of identifying payees almost daily at his office, after asking the usual questions provided by law and the rules of the department, accepted the identification as fulfilling all the requirements of section 1297, Postal Laws & Reg. 1887, and gave to Schuman, in the name of Anton Erben, a check on the defendant bank for the amount of the orders, fully believing him to be the Anton Erben named in the orders as payee, and entitled to the money. Reuter then went with Schuman, as was his custom, to the bank, and identified Schuman as the payee named in the check, and as the person who had just been identified by the post-office department as Anton Erben, and entitled to the money. The check being payable to Anton Erben or order, Schuman and Reuter each indorsed it, Reuter signing as "C. Reuter, Agent." And thereupon the bank paid to Schuman the amount of the check, which he began immediately to spend lavishly and foolishly about the city, purchasing, among other things, a gold watch, a gold-headed cane, four gold rings, and a rather expensive pipe. This coming to Reuter's knowledge the next day, his suspicions were aroused, and he tried to find Schuman, but it was too late. Schuman had gone, no one knew where, and has not been found. About January 19, 1890, the real Anton Erben came to Milwaukee, and presented himself before the secretary, and recalled himself to his recollection. Reuter questioned him, and told him that his money was gone. "Ah, no," says Erben, "no one can get my money without the password, and no one knows what that is but my father and I." Things remained in about this state until March 9th or 10th, when Erben made complaint, and stated the case to Moritz Von Baumbach, the Austrian consul at Milwaukee. On March 10th there was a newspaper account of the matter in the Milwaukee Sentinel and Herold, the latter being a German paper. Both the bank and post-office officials saw these accounts. The post-office department at Milwaukee and at Washington had notice of the fraud about this time and before March 15th. The consul at Milwaukee went to Mr. Nowell, the postmaster, for information, and had a talk with him on March 10th or 11th. Mr. Nowell showed him the orders, and told him that he had done his duty, and that the man had been properly identified by Mr. Reuter as agent of the society. After Erben had made his complaint to the Austrian consul, and about March 11th, the consul made a report of the case to the Austrian min-

ister at Washington, and also notified the post-office department at Washington, and asked for redress. About April 15th the government appointed E. L. West to make an inspection of the case, and report, which he did immediately, and on April 17th the post-office officials made a demand on the bank for repayment of the money. Another formal demand in writing was made in June following, and on July 21st the department paid the amount to Erben .by another check on the defendant bank. The court is of opinion upon these facts that the plaintiff cannot recover.

The bank used due diligence in having the holder identified, and paid to the very person to whom the check was delivered with the intention that it should be so paid. The most cautious and conservative bank in the country would have paid upon the same evidence of identification. While I cannot say that the post-office officials were guilty of any distinct want of caution or diligence, still, as between it and the bank, the fault and misfortune in failing to discover the fraud were the government's. The post-office officials, upon full inquiry as required by law, determined that Schuman, who had the orders in hand, was Anton Erben, the payee named in the orders, and delivered him the check by that name, intending and expecting that the bank should pay to him as the real Anton Erben. The case, in my judgment, should be ruled upon the same principles as those of *Bank* v. *Shotwell*, 11 Pac. Rep. 141; *Robertson* v. *Coleman*, (Mass.) 4 N. E. Rep. 619; and *Maloney* v. *Clark*, 6 Kan. 82. The name is only one means of identifying the payee, and is frequently not the safest and best. As said by the supreme judicial court of Massachusetts in *Robertson* v. *Coleman*, above cited:

"The name of a person is the verbal designation by which he is known, but the visible presence of the person affords surer means of identifying him than his name. The defendants, for a valuable consideration, gave the check to a person who said his name was Charles Barney, and whose name they believed to be Charles Booney, and they made it payable to the order of Charles Booney, intending thereby the person to whom they gave the check."

So here the plaintiff gave its check to a person who said his name was Anton Erben, who was identified as Anton Erben, and whose name it believed to be Anton Erben, and made it payable to the order of Anton Erben, intending thereby the person to whom it gave the check.

The question for the bank is, "For whom was this money intended by the drawer?" And the name is but one means of determining that question. In London, where there are several thousand John Smiths, the identification of the name alone would be a poor guide, in a case where John Smith should present a check or bill for payment. But it is the duty of the bank in such a case to look for further identification of the person, and to make no mistake in paying to the person intended by the drawer. In this case, the knowledge of the delivery of this check to the bearer, after the strict and searching inquiry which the law requires at the hands of its officials, was a much stronger means of identification than a mere identity of name. It was the duty of the department to ascertain the true individual, and to pay to no one else. Without

doubt the postmaster would have paid currency instead of a check, if he had had it in hand, rather than in bank. If he would not, it would be very good evidence of neglect to deliver a check to a party, and put it in his power to draw the money on a forged indorsement in circumstances where the postmaster would not have been satisfied to part with the cash. Allowing the drawer and drawee to be equally innocent, the loss should fall upon that one who, by his act, has been the occasion of the loss, which in this case, I think, was the department. Though there may have been no express negligence on the part of the officials of the post-office, it was a mistake to deliver the check to a person not entitled to it, and that mistake has been the occasion of the loss. The post-office officials had every reason to believe that the bank would pay upon the identification and proofs which had actually induced them to deliver the check. The fraud—the imposition—had been mainly accomplished when a check for the money was delivered to Schuman as the true payee named in the money orders, and it does not seem to the court either just or legal, after all that had taken place, to shift the responsibility for the loss upon the bank. Where both are innocent, and the loss must fall upon one, it should be upon the one who, in law, most essentially facilitated the fraud. *Stout* v. *Benoist*, 39 Mo. 281. So in respect to two persons equally innocent, where one is bound to know and act upon his knowledge, and the other has no means of knowledge, there seems to be no reason for burdening the latter with loss in exoneration of the former; or, if both are equally innocent and equally ignorant, the loss should remain where the chance of business has placed it. *Gloucester Bank* v. *Salem Bank*, 17 Mass. 33; *Bank of U. S.* v. *Bank of Georgia*, 10 Wheat. 333; *Price* v. *Neal*, 3 Burrows, 1355. The language of Lord MANSFIELD in *Price* v. *Neal* is, I think, applicable to this case. He says:

"It is a misfortune which has happened without the defendant's fault or neglect. If there was no neglect in the plaintiff, yet there is no reason to throw off the loss from one innocent man upon another innocent man. But in this case, if there was any fault or negligence in any one, it certainly was in the plaintiff, and not in the defendant."

2. There is, I think, another reason why the plaintiff should not recover. The department waited over a month, from about March 11th to April 17th, after having notice of the forgery, before returning the check to the bank, or giving any notice of its intention to hold the bank liable. This was, within all the cases, an unreasonable time to wait. The notice should have been given without unnecessary delay after discovery of the fraud, to enable the bank to pursue any remedy it might have against the forger or indorsers. It is no doubt true that full knowledge of the forgery may not have been in possession of the government until the coming in of the special agent's report. But it was apprised of the fraud before March 15th, and knew substantially all that was afterwards reported of it by the agent. It certainly knew enough of it to put it upon inquiry. It is urged in answer to this objection that the defendant also had notice of the fraud about the same time. But that was not enough. The government did not repay the money until July, and the

bank could not assume, without the return of the check and demand of payment, that the government intended to pay, or to hold the bank responsible. 2 Pars. Notes & B. 598; *Redington* v. *Woods,* 45 Cal. 406; 3 Amer. & Eng. Enc. Law, 224, and cases cited; *Cooke* v. *U. S.,* 91 U. S. 396; *U. S.* v. *Bank,* 6 Fed. Rep. 134; *Gloucester Bank* v. *Salem Bank,* 17 Mass. 33. Judgment for defendant.